Judge Roth and I would like to welcome Judge Nora Barry Fisher from the Western District of Pennsylvania who is sitting with us, I believe, for the first time. And Judge Barry, we welcome you, or Judge Fisher, we welcome you and hope that this is the first of many times. Well, thank you, Judge Ambrose and Judge Roth for including me on this panel. It's my privilege. And we hope next time you come, you don't break your foot. Yes. I would hope so. That'll put a hitch in your get-along, that's for sure. We'll announce the first case. It is Sabinsa Corporation v. Creative Compounds LLC. Mr. Holm and Mr. McNulty. May it please the court, my name is James Hume and I represent Sabinsa Corporation, which was the plaintiff below and is the appellant in this court. With the court's permission, I'd like to reserve five minutes for rebuttal. That's fine. Thank you, Your Honor. We submit that this case really can be decided based on one Third Circuit precedent, that this is essentially costs, pharmaceuticals, all over again, although even more so. We think that the error committed by the district court, which incidentally was the same district court as the cost case, is even more apparent in this case. The big problem that I have with your case, it seems to me that it would be much, much stronger if you were retailing force lean to consumers, but you're, and maybe that's what you're considering for the future. But here, you're just going to what, giving it to manufacturers? That's where the sales were. There was some evidence that the force lean is on some of the consumer labels that our clients' agreements do require that, but that would be a minority, an unusual, more unusual situation. But we don't think that the trademark laws say that if you're engaging in basically wholesale activities, that somehow you're less protected than if you're engaging in retail sales. Well, it affects factors. It does have an effect on the factors. Under four and six of lab, I mean evidence of actual confusion, if it were the public and you had surveys and whatnot, you'd have a pretty good case. This seems like, to the manufacturers, they can distinguish much more readily than can a consumer. Your Honor, the situation, the facts were here were pretty stark. In fact, my client essentially, of course, invented this use and discovered it of the coleus for using weight loss or lean body mass and went ahead and not only got a patent on the use, which is undergoing reexamination right now, but trademarked the name. And the evidence even from the defendant was that Forslean was the only brand in the market. And we spent a lot of time and effort building up the brand where we were the dominant brand going into 2002, 2003. And in fact, I think one compelling piece of evidence that District Court even acknowledges is that JA601, it's the front of Nutrition Industry Magazine, where it was an article on protecting the golden eggs, IP, in this industry. And there's Forslean right front and center as one of the dominant brands in the entire industry, not just for coleus. You then had the drought happen. And we submit that the evidence was pretty overwhelming that Creative Compounds was very opportunistic. They had been selling small amounts of coleus, but the drought happened. And suddenly, they came to market with the return of coleus and announcing Forslean. But how can we expect manufacturers of nutraceuticals to be confused for any significant period of time between these somewhat similar but distinguishable marks? And I mean, I've got them right in front of me here. Right. Well, we think that when you look at the marks, I mean, compared to the marks in COS, the similarities are even more stark. You have the same number of letters. You have them starting with the same prefix, fours. They end with the same sound with the end. But for manufacturers, it's their job to know the ingredients they use in their products. Actually, the evidence was not that before the court. In fact, the defendants testified that you had cowboys and unscrupulous marketeers in this industry. It's one of the problems my client has identified and has been quite diligent about with its scientific focus in trying to rid the industry of the cowboys and unscrupulous marketeers. Mr. Norton explained that many times you have a sales clerk calling up to order something. They've just been told to go get coleus without giving any direction as to where they're going to get it. So this idea that this is an industry of... No. I mean, what if they put it out under the name of creative compounds? For trademark purposes, I mean, that's our patent case, and we did not bring a patent claim in this case. There never has been one. So they would be free under trademark law to sell coleus under a different name. And what was the reason that the U.S. Patent and Trademark Office never did grant you a patent, by the way? It was granted. We submitted it for reexamination because of some of the issues that arose. And I have not been directly involved in that, but it goes to really the issue between lean body mass and weight issues. There were some prior art, I believe, that dealt with coleus being used for weight loss that were issues as to whether it was significantly different with lean body mass. We think that the problem here is that the district court did exactly what it did in the cost case, that it only analyzed a few of the lack issues. And lack, by the way, was designed for products that weren't directly competitive. Here, not only do we have a product that's directly competitive, we have the same substance. This is the same product. It's not even something that is somewhat similar. It's the same thing. And this court has held a long time ago that when the dominant portions of the two marks are the same, confusion is likely. That was back in the country floors case where the word country. What evidence did you have that there was confusion among the manufacturers? We did not point out any evidence of actual confusion among the manufacturers. I would point out, however, that the evidence was there that the minute that Creative Compound started marketing the product as forced thin, its sales shot through the roof compared to what they had been. They were almost minuscule to begin with, weren't they? They were relatively small. Your client had by far the dominant share. My client was a huge part of the market. We were the market essentially for the most part until Creative Compounds came along with the forced thin and started taking away market share. We think that based on the trademark law, where you have marks that are so similar here to be almost identical, that the confusion should be inferred by the court. I would like to point out that the court also committed a combination of errors that we think were clearly erroneous and then also some legal errors that it did. For example, in looking at the strength of my client's mark, what the district judge there did is did not consider the strength of the mark. He looked at the Creative Compounds mark and said, well, they are known to both customers and therefore the marks are equal strength. That's at Joint Appendix 26 and 27. That's the wrong test. What the court should have done is evaluated only the Sobinso mark. And had he done so and the evidence of it, as the courts acknowledged here, we were the dominant force in this market. The mark was extremely strong. When people thought of Coleus in this industry until forced thin came along, they thought of Fors Lean. It was the only mark out there. So we think that there's an example where the district court just applied the wrong standard and it's a clear error of law. Well, what you're really saying is you think that factor supports you, but you have to look at all of the LAP factors. Yes. And we've gone through those in our brief. I obviously don't have time in my 10 minutes today to go through them all. The court did not look at all the LAP factors. That's another issue here. The court really did not consider a number of the factors in LAP. For example, really the channels of commerce here did not look at the means of advertising. 7, 8, 9. Yes. Yes. They just were not considered by the court. And we think here, again, it's the same thing that happened in costs where he only considered two of the factors in costs. And this court ruled that. Although it appears here the court focused on the primary factors. Well, what the court really focused on was that there was no evidence of actual confusion. In fact, it appears nine times in his opinion. But isn't that the key? No, it's not. In fact, this court has held that the absence of actual confusion is quite common because it's very difficult to come up with evidence of actual confusion. We don't know if a customer was intending to buy Forslean and went and bought Forsen. It's hard to determine that. Frankly, given the amounts that were sold here, a survey would not have made it anomalous. How many manufacturers are there of the Corlea's product, that take it and put it into a product that they manufacture? How many customers do we have? Yes. I don't have a hard number, but it would be in the scores. And there was evidence that it's constantly changing. Over half of the customers that Creative Compounds identified, and this is at the end of the appendix in Section 4, we have the invoices sorted by customer. Over half, 18 of their customers, which was over half, as they had in the 30s, were one-time customers. And, again, that was a clear error the district court made because he had found that most of the customers were continuing and repeat customers. That's clearly contradicted by the documentary evidence in this case. So I see my time's about up. That's okay. No, there's some more questions. Okay. I'm happy to answer them. You're on our time now. Okay. If the key, you say, isn't confusion, what is the key? The key is the likelihood of confusion, which is to be identified by the factors in LAP and in the cost case. And the first thing you start with are the marks themselves. And as this court has held, when you have marks that are for competing products, a similarity in the marks, basically that's the beginning and the end of the inquiry, or it's most of the inquiry. It's the predominant factor here. We think the court applied the factor, the first factor of the similarity in the marks, just totally incorrectly here where you have marks that have the same number of letters with the dominant feature fours leading off. That's evidence of confusion right there. Thin and lean are both words that connote weight loss. And, in fact, one of the defendant's witnesses who was a customer, he uses both force thin and force lean in two different products, but they're both weight loss products. Let me ask whether, because over the years I've seen various fads in weight loss, I've seen various substances used in weight loss. Is force colon something that seems to have a permanent niche in weight loss preparation, or is it something that has peaked and will decline? I think that, actually, based on events in the last couple of weeks, you're going to see a greater demand for Coleus because it is a safe product. And it's been around now for 10 years since Sabinza invented it, basically, its use in the weight loss industry. There was a recall and a banning of one of the other weight loss products from the last week. I went around the world last month, and so I was away from the current news. Well, the FDA has banned it. I forget the name of it. It's another weight loss ingredient. But Coleus is considered a very safe one, and we would expect that it's here to stay and would grow in importance as others fall away. If the court should decide the way you want us to decide, what action would you propose that the court take? We would ask the court to do the same thing that was done in Kos and also to do what Judge Garth suggested in his concurring opinion in the Faison's case, Faison's versus Bigarell, where we think that the error here was so manifest, both legal and the clear error, that this court should remand with an order to enter judgment for Sabinza and assess damages. So it would be a limited retrial on damages and injunctive relief. That would be the relief we would request. We do not think a retrial on this record is necessary because of the plain error, both the plain error and the legal errors committed by the district court. Well, if it were remanded, it would not be for a retrial. That would be for reconsideration of the evidence presently before the court. Right. But as this court did in Kos, which was an appeal from a preliminary injunction, but Judge Oberdorfer said that the error there was so complete, both legal and factual, that they've considered whether to direct the district court to remand to weigh the lab factors anew or to just enter judgment. And here this court ordered that the district court just enter judgment for Kos Pharmaceuticals on remand. And we believe the same relief would be appropriate in this case because of the court's really failure to consider a number of the lab factors, but the two in particular are the similarity marks and the strength of the mark where he found in favor of the defendant. We think he committed legal error there, but also his findings were clearly erroneous in that he ignored the undisputed evidence of strength in the record and the similarity in the marks. I'll reserve the rest of my time. Thank you very much. Thank you. Mr. McNulty. Good afternoon. Kevin McNulty for Creative Compounds, LLC. Your Honors, I – When you look at the face of these marks, force thin and force lean, I mean, why did you use the word force, F-O-R-S, if it wasn't somehow an intent to get the goodwill that existed with regard to the subventsive product? Oh, that's an easy one. For the same reason that they used the prefix force. Their president said when he was asked at trial, why did you use F-O-R-S as your prefix? He said, oh, because of force colon. That's the active ingredient. Our witnesses said the same thing and for the same reason. But it's what, coleus force colon. I mean, okay, fine. Why did you do thin, which is, to most of us, synonymous with lean? Thin is not synonymous with lean. I'm not suggesting they're opposites. In my mind, it's synonymous. Speaking personally, I'm not taking judicial notice, but a lot of people consider thin and lean have the same implication and when you're thinking about your weight, have the same goal in mind. Sure, that's true. But in the health field where these things are sold, they have distinct meanings. I'm not suggesting they're opposites. Lean cuisine. Sure, I can't speak to lean cuisine, but I will tell you that the evidence at this trial, which did not have to do with lean cuisine, said that the people who buy this product have a distinct concept in mind. I mean, your client uses thin and lean both on their products with the same purpose to lose weight, right? You know, that is an exaggeration of the record that I must accuse my adversary of. What happens is they have a naming strategy, you know, blank, active ingredient, you know, prefix, plus thin. They have one product called octopelene for which the active ingredient is octopelene. That predated the thin naming strategy. It's one of their old products. There's a single exception to their naming strategy, and that's all there is to it. It's one outlier. But they do have distinct meanings. As I said, I'm not suggesting to you that they're opposites. Did you initially sell forscolin under the forced thin mark? Sorry? Did you initially sell forscolin under the forced thin mark? No, I think they just sold it as a generic ingredient initially. Well, why did you wait until the supply of coleus forscolin was so low to jump into the market? I don't think that appears of record, but I'm sure you could infer that they saw a commercial opportunity, since they had a good source of supply, to jump into a market. And there's nothing wrong with that. There's nothing wrong with aggressive competition. Well, there's nothing wrong with jumping into the market, but when you adopt a name that is almost identical to your competitor's name, one can consider whether that, what the intent was, and whether there is a likelihood of confusion. Well, one can consider that as an original matter when one is the fact finder, Your Honor. But that's not the position we're in here. And the argument that I've heard this morning were perhaps very good fact finder or jury arguments. But we've got findings of fact here as to the genesis of this, as to the fact that fours to people in the trade means forscolin. And by the way, forscolin, just the one word, is the name of this ingredient, not the Latin technical name, but the name of the ingredient. And that's why the coleus goes out the window, because coleus is a house plant and a lot of other things. Forscolin is the name that people use for this ingredient. So what we're really doing is flying in the face of the clear error standard, Your Honor. Would this case be any different if both parties sold retail items? Certainly the balancing, I don't know if it would come out differently, and that's not the case presented to us, but the balancing would probably take a different form because you'd be looking at different kinds of customers. That is, not people who almost as a matter of logical certitude cannot be confused as to the source of this product. They come to, you know, there's Joe and there's Fred. And you go directly to Joe to buy the one product, and you go directly to Fred to buy the second product. You can't be mixed up. But a lot of the customers are one-time customers, aren't they? Some of them are, but the majority of the business is done, as the court found, with repeat customers. And these are people who must – and it is, by the way, a multi-step process of purchase usually. The people call up, they ask about availability, they do a purchase order, they talk back and forth, they email with, you know, at creativecompounds.com. You can't be confused about who you're buying from. And they're emailing not the logo here, but just using regular capital. Sure, and another way to – but another way to say that is that these are not like people buying a pack of gum. That is, they are not depending on the logo to figure out what the source of this product is. No, but they are seeing the name spelled out, not as it is in the logo, but simply spelled out in regular typed letters. If they're typing an email, certainly. If they're looking at a package or an advertisement, certainly not. And the packages, by the way, don't just say Force Lean or Force Thin on them. They have the name of the company on them, too. Nobody can be confused about where this is coming from, and that's the only thing we're talking about. What about me if I'm starting up a weight loss company, and I think, well, now I've got to – what's that – that's Forks Golan. Who's the guy – there's a guy that started out selling that Force something, and I pick up something and see Force Lean. I say Force Thin. Well, that sounds like what I'm thinking of. Let's call those people up. Not a single example of that in living memory in the record. We had the sales guys from both companies. Granted, no one is arguing with that, but in thinking about possibility of confusion, isn't that the sort of thing that happens when someone new comes into the industry, or when – God knows, at my age, sometimes I think, well, I know it begins with Force, and it means something about losing weight, so is it Force Thin or Force Lean or whatever it is. I think that is confusing to me, and if I were someone starting up a weight loss nutraceutical company, I can see a great possibility of confusion between what is this thing with Force Golan in it, and the first one I saw, I probably will think, well, that's what I'm thinking of, because that rings up with my recollection. I take your point, Your Honor, but I think your question suggests the answer, which is this. You're in business. You're making a multi-thousand-dollar purchase of an important raw ingredient that's going to be consumed by humans. That is, it's not like going to the grocery store and saying, oh, there was this detergent, and I saw a commercial for it. So I find Force Thin, and I call up your company, and I say, are you the people who produce Force Golan for weight loss? Are you going to say no? You want to call up Sobinsa? No, if you say Force Golan – and, again, I think I understand what you're asking, but if you say Force Golan, I will answer yes, because that's the generic name of the – Force Golan is Force Golan. That's the generic name of the ingredient. Oh, I see what you're saying. Yeah, and you aren't going to say, oh, you called up the wrong company. I said, I heard of this Force Golan product called Force something. Are you the guys who sell it? And you would say yes. And maybe I really wanted the Force Lean. Anything is possible, Your Honor, but there's absolutely no record basis for that. And I should also point out – Isn't there a possibility for it? Isn't that a lap factor that we've got to consider? Anything is possible, Your Honor, but let me point out – Well, let me just add on to that. What if the market is entirely dominated by Force Lean and you see this and you know about it because of what Sobenza has done? Isn't it more likely than not that you're going to be really looking for that product and instead get another product, the Sobenza product? No, I don't think it's more likely than not. Well, it's the one manufacturer that's seen for years on the market. If you've seen it for years on the market and if you are in this business, you know who you're buying from. Well, you know there's a product, a Force Golan product that is sold by a company and you haven't bought it before. You're, I think, in a position where you could easily be confused because you've got the Force. You know it's Force and you know it's something about losing weight. And between Lean and Thin, I think that those are so close together that the person could easily be confused by Lean, by Thin as opposed to Lean. A potential customer who is a manufacturer of weight loss products. I can only say, Your Honor, and we're probably going in circles here, that what we're doing here is theorizing a confused customer. And a confused new customer, there is absolutely no record basis for assuming that. And there are well-supported factual findings. For actual confusion, but potential confusion, is a separate element that we have to consider. It is true. And I should point out, by the way, something that came up in the argument, which is actual confusion, correct, is not the ultimate issue, but is very powerful evidence of the ultimate issue, which is potential confusion. And I should also point out that for potential confusion, you should see something like customers calling up saying, Hey, is this the company? Are you the Force Lean guys or the Force Thin guys? There is none of that. There is nobody even expressing the potential for confusion in the record here. But potential confusion, the test is likely to create confusion. That obviously means the potential for confusion. Right. Why isn't there the potential for confusion here? Especially if, well, why don't you answer that first and then I'll go. I have two questions to follow up on that. Let me back up one step from that question and say, you can always hypothesize some imaginary extra record potential for confusion. This court, however, has affirmed in cases involving two trademarks, one called checkpoint and the other one called check space point. It is affirmed in cases involving the miracle bra and the miracle suit, which are apparently both intimate apparel that perform the same miracle. But the mere similarity of two names is not dispositive. And then two names are not that similar and there's ample record support that they are, Thin and Lean are terms of art. Force is a term of art that people know in this trade and that this is limited to the trade. It's not like cost pharmaceuticals where they're going over the doctor's head and telling, you know, ordinary consumers with no medical sophistication, you know, ask the doctor. Yeah, but ordinary consumers are still going to get it through the doctor. Right. That's what I'm saying. Okay. So that does not put it quite in the position that you were presenting it to us. Well, no, I think, actually I think we're saying the same thing. I'm saying that in cost it was determinative that they could not say, hey, our target demographic is doctors. The cost case said, no, it's not because you are also advertising over the doctor's head. Yeah, but, and I am saying to the contrary that the patient can't get it except through the doctor. Right. So that that possibility of confusion is tempered by having to go back through the doctor. It tempered somewhat perhaps, but they found it to be a mixed class of customer. Well, I go to the doctor. He tells me what to get. I don't tell him what I want. Well, some people do, unfortunately, which is why the learned intermediary defense is gone in New Jersey, basically, for anybody who advertises their medicine. But it's no longer a defense. Does Creative Commons? Yes, ma'am. Ms. McNulty, in addition, Judge Roth brings up a good point relative to advertising. Doesn't your client also benefit by the advertising that was done by Savinsa? They had done much more extensive advertising. They have literature. They have brochures. Yes, no, maybe. No. For their product they have advertisements, which, again, go to the trade. Nobody can get mixed up about who they're buying this from. And we're not talking about confusion in some general or abstract sense. You've got to be confused about who you're buying from. That's what we're talking about here. And your point is that your product and Savinsa's product is bought by manufacturers or compounders, not the retail market, not even a physician in his office. Exactly. Does Creative Compounds have any desire or any plans to go into the retail market? Not that I am aware of, Your Honor. I'm not a mind reader, but I've never been told that, and I'm unaware of it. Again, that would be outside the record, but I will represent to you that I have no knowledge of it. Judge Kavanaugh never addressed whether the goods were similar, marketed through the same channels of trade, advertised in the same media, or targeted at the same parties. Shouldn't he have considered those at least? One of them, actually, he did consider, the channels of trade. He put together with the factor number three, which is the kinds of customers and so on, he explicitly said, I'm addressing this seven together with three. So that actually is wrong. The channels of trade, of course he made findings of the channels of trade. He didn't necessarily put everything under the number where it went. But in terms of how these are sold, how they're advertised and so on, it's very clear what the evidence was. And frankly, we concede that Forskollin is the same stuff. We put in evidence and so did they as to where they advertise, and those exhibits are there. And there's frankly no dispute as to most of those issues as far as I can tell. But isn't that what the district court judge is supposed to do, take all of the evidence, take the proposed findings of fact and conclusions of law, and then put forth what he or she finds as the findings and the conclusions of law? We have parts of his opinion where he basically lumps things together, where he says, based on all of the records. Now, shouldn't he have parsed this all off her lap? I think he did, certainly in an acceptable manner. It's very, very clear what the basis for this decision is and what the evidentiary background of the decision is when you read through these findings. And again, in my brief, I set forth under each one the evidence, the very ample evidence that would support a finding on each one of those factors. And it's there, and it's there in huge stacks. Well, you have done it, but if the judge, isn't it the judge who has to do it? Sure, but the judge has to make findings. The judge does not have to recite each individual piece of evidence that came in in the case and say, you know, findings of fact don't usually go like that, especially oral ones. If we feel that there are portions of the evidence that are not inadequately considered by the judge, shouldn't we make sure that that is considered by the judge and remand the case for consideration of those factors? I don't think that a remand for consideration is appropriate in this case. To answer your narrow question, of course, if you find that, you know, by definition, if you find that the consideration was inadequate, then you ought to remand. But the basis and the factual basis and the evidentiary basis for this decision is quite clear and quite overwhelming. And the most overwhelming factor is perhaps the one of the channel of trade and the nature of the customers and the fact that they spent thousands of dollars on it. They simply cannot be confused. In addition, I should point out that there is nothing wrong with the way that Judge Kavanaugh looked at and considered the marks. This is portrayed as some kind of error of law in looking at them side by side. It's very, very clear. He stated three times that the standard is the overall impression based on, you know, appearance, meaning, and so on. And he made his finding in those terms. The fact that he looked at each aspect individually is not an error of law. It is the judge being careful. Judge Kavanaugh also – I should also back up and point out the following, which is that, you know, these ten factors, of course, are ten factors and they're very important. This Court has said over and over again they are guidelines. They're not a checklist. The judge is fine picking out the ones that the judge believes are most important under the circumstances of the case. That's what Judge Kavanaugh did, and he explained why the ones he picked out were the most important under the circumstances. There is nothing wrong with these findings under Rule 52. Actually, what you usually see is in someone going through the lab factors,  I'm not going to say much about, let's say, factor seven because I don't consider it relevant for the following reason. I'm not going to say much about factor eight because I don't consider it relevant for the following reason. That at least tells an appellate court that, A, I've considered it, and here's why I don't give it much relevance. Well, the only ones as to which there aren't explicit findings are eight, nine, and ten. Even my adversary doesn't talk about ten. Nobody really had anything to say about it. That leaves eight and nine. And, again, as I said, you're not going to find any clash of evidence that needed to be resolved on them. I mean, neither side gave it much attention. Everybody agreed it was a wholesale clientele. Everybody agreed that the evidence of overlapping customers was one customer and that everybody buys directly from the manufacturer. That's what's going on in those factors. There's no real clash there. That's why the judge felt, I'm sure, that he had given it enough attention under the rubric of the other factors. And these factors, by the way, overlap greatly. I mean, the same evidence comes up again and again, and it's artificial to divide it by the ten. I see I'm way over time, but I'll be glad to answer whatever you like. Judge Fisher, any more questions? No, I don't think so. Thank you. Thank you, Your Honor. Thank you. Mr. Hume? Thank you, Your Honor. Both Creative Compounds and counsel are somewhat rewriting history. I don't want to draw the Court's attention to it. They're suggesting that the industry name for the substance is Forskolin. In fact, it's not. It's Coleus. If you look at JA-649, it's the introductory Creative Compounds ad that we point to. I think the reason isn't the technical name Coleus Forskolin. That's the formal name, but what it's commonly called is Coleus. In fact, the caption on this advertisement is the return of Coleus, not the return of Forskolin. And this is the ad that introduced the Fors name. If I go into a health store today, what name would it be under? I've usually heard it called Coleus. We called it Forskolin a lot in the trial because of the Fors name, and I think people were trying to focus on that. But, frankly, the more common name I'm familiar with is Coleus. And that is in the record below that the more common name is Coleus? Well, I don't know that it was ever testified to that way, but it's certainly in the ad that Creative Compounds put out the return of Coleus, which I think you certainly can take it from that. The contemporaneous use by Creative Compounds before there was a dispute here was calling this Coleus, not Forskolin. In response to your question, Judge Roth, and I think also Judge Amber, about the potential for confusion, I think you can look at the increase in sales here that's undisputed. The invoices are in the record. Judge Kavanaugh didn't consider that. But that's certainly evidence of the potential for confusion here because you had Creative Compounds drifting along at a very low level of sales. They adopt the Forskin name, and suddenly their sales skyrocket relative to what they were. That certainly is concrete evidence. What percentage of the market do you have or did you have at the time this occurred in 2004? Frankly, I'm not sure, but I think we were in the 90s in terms of percentage of the market. And the percentage of Creative Compounds went from roughly zero to what in 2000? I wouldn't be able to quantify that because I don't know what the other sellers are out there in terms of any other manufacturers. But, you know, it's the business that created this market. We did the clinical studies. We did the advertising. We've gotten the awards for Forsklin. We built the market up. And in our view, Forsklin was an effort to take it away using the name. And that's the fundamental problem here. We think that Judge Kavanaugh did not do what this court requires, and that is to address the overall impression of the marks. He had them side by side, much because of the exhibit that Creative Compounds put in evidence, put them in side by side. And that's not the way that they should be analyzed. The court, he should have addressed the overall impression. He committed both errors. He broke them apart and compared the individual elements. That was an error of law. And then he failed to address the overall impression. He ignored the similarities. Yes? Yes, right. Did you seek reconsideration once you received his opinion? That's a good question. I do not believe that we did so. I think we came straight to this court, if I'm not mistaken. But that was a while ago, so my memory may be playing me tricks. But I think we went straight on appeal, if I'm not mistaken. Because much of your argument is that he incorrectly found facts against your client, and if he will in favor of Creative Compounds. I mean, wouldn't it have been appropriate to go back to the fact finder and have him take another look? I think his opinion was pretty clear that, I mean, in our view, he wasn't inclined to do that. But we think there were legal errors there as well that the court committed, for example, in the application of the factors. As Judge Oberdorfer pointed out in Cost, these decisions are reviewed plenary by this court for the law and the application of the law to the facts, and on a clearly erroneous standard for the findings of facts. And we think a number of the mistakes here were made by Judge Kavanaugh as to applying the law. In fact, I'd like to, if I may, just quote one thing that Judge Oberdorfer said in the Cost case, because I think it summarizes the problems here. The most important factor, market similarity, favors Cost. AdvoCorp and AltaCorp are similar in sound and appearance, and neither has any meaning that could distinguish between them or lead customers to associate them with distinct products. But at the same time, no one lap factor is determinative, even though one may be more important. Right, right. It's not determinative. Exactly. But this is certainly the most important. The AdvoCorp mark is entitled to broad protection because it's a coined term and because it's a strong mark, both conceptually and commercially. We think the same applies here. They're certainly both coined terms. There's no fores lean or fores thin in the English language. It has no meaning by itself. The products in question are closely related. Again, in this case, we have the identical product, and are marketed and sold to practically identical audiences in practically identical ways. Same thing in this case. These are products customers could easily expect to manufacture by a single source. The same thing here, when the expectation was that Sobenza was almost the exclusive source for a long time. Also in KASA's favors and – But if you're going to show likelihood of confusion, isn't one of the things you would do to show that is to have some manufacturer testify, saying, I thought I was buying a Sobenza product, and it turns out I guess I wasn't. I was buying a Creative Compounds product. If you could discover that actually happening. Why can't you discover that? Well, I think one of – That's actual confusion as opposed to – Yeah, that's actual confusion, and I think if – obviously, had we had that – But one of the factors is actual confusion, right? Yes, it is. It absolutely is. But it's also – This court has said time and time again that actual confusion is not required, and one of the reasons it's not required is it's very difficult to come by. And that – It's not required, but if you had had it, that would have made your case much stronger. I think if I had had it, I'd probably be sitting over there rather than over there in this case, because as I said, Judge Kavanaugh certainly seemed to be impressed with that. He mentioned it nine times in his opinion, and we think inappropriately in consideration of some of the other factors. He kept weaving in the lack of actual confusion. We've pointed that out in our brief where he did that. So we think if you look at costs, and if you look at Fison's, too, Judge Kavanaugh committed reversible error here, and we ask this court to reverse and to remand with directions to enter judgment for Savinso. Thank you very much. Thank you, Your Honor. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement.